UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON PRICE,

                    Plaintiff,                Civil Action No. 13-11217
                                               Honorable Mark A. Goldsmith
                                               Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 19]**

Plaintiff Jason Price ("Price") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 19], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Price is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [19] be DENIED, Price's Motion for Summary Judgment [16] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to

the ALJ for further proceedings consistent with this Recommendation.

## II.   REPORT

### A.   Procedural History

On January 18, 2011, Price filed applications for SSI and DIB, alleging a disability onset date of June 1, 2008.  (Tr. 187-202).  These applications were denied initially on May 18, 2011.  (Tr. 128-31).  Price filed a timely request for an administrative hearing, which was held on May 3, 2012, before ALJ Kyle Andeer.  (Tr. 38-61).  Price, who was represented by attorney George Borgelt, testified at the hearing, as did vocational expert Annette Holder.  (*Id.*).  On July 20, 2012, the ALJ issued a written decision finding that Price is not disabled.  (Tr. 24-33).  On January 17, 2013, the Appeals Council denied review.  (Tr. 1-6).  Price filed for judicial review of the final decision on March 19, 2013.  (Doc. #1).

### B.   Background

#### 1.   *Disability Reports*

In a January 8, 2011 disability field office report, Price reported that his alleged onset date was June 1, 2008.  (Tr. 220).  The claims examiner noted that, during a face-to-face interview, Price was alert, coherent, and responsive.  (Tr. 222).

In an undated disability report, Price indicated that his ability to work is limited by diabetes, hypertension, a heart condition, high cholesterol, and joint pain.  (Tr. 225).  Price reported that he stopped working on January 23, 2005, because of his conditions, and he has not worked since that time.  (*Id.*).  Prior to stopping work, Price worked briefly in several different jobs, including dishwasher, general laborer, and machine operator.  (Tr. 226).  Price earned a GED but had no further education.  (Tr. 225-26).  He indicated that he had treated with several doctors regarding his mental and physical impairments and was taking several different medications.  (Tr. 227-31).

In a function report dated February 8, 2011, Price reported that he lived alone in a shelter. (Tr. 241). When asked to describe his daily activities, Price indicated that he eats meals, takes naps, takes his medication, and watches television. (Tr. 242). When asked to describe what he could do before the onset of his conditions that he can no longer do, Price indicated: "anything physical or heavy." (*Id.*). His condition interferes with his sleep: it is difficult for him to breathe when he sleeps on his back, and his chest hurts when he sleeps on his stomach. (*Id.*). He does not have any difficulties with personal care but sometimes needs reminders to attend to personal care tasks or take medication. (Tr. 242-43). Price does not prepare his own meals, but he is able to do some housecleaning. (Tr. 243). He does not go shopping, but he is able to pay bills, use a checkbook, and handle a checking and savings account. (Tr. 244). His hobbies include watching television, which he does for two or three hours every day. (Tr. 245). He does not go anywhere on a regular basis, and has difficulty getting along with others. (Tr. 245-46).

When asked to identify functions impacted by his condition, Price checked lifting, bending, walking, stair climbing, memory, concentration, understanding, and using his hands. (Tr. 246). He can lift up to thirty pounds and can walk for two or three blocks before he needs to stop and rest for fifteen minutes. (*Id.*). He can pay attention for twenty minutes and can follow written and spoken instructions fairly well, as long as they are "short." (*Id.*). Price does not finish what he starts, however, and does not get along well with authority figures. (Tr. 246-47). He does not handle stress or changes in routine well. (Tr. 247).

### 2. *Price's Testimony*

At the time of the May 3, 2012 hearing before the ALJ, Price was 42 years old. (Tr. 58). He had previously received Social Security disability benefits for a closed period after he underwent quadruple bypass surgery. (Tr. 42-43).

From a physical perspective, Price testified that he continues to suffer from chest pain stemming from his cardiac condition. (Tr. 43). In addition, he is diabetic, has hypertension, and – a few months prior to the hearing – allegedly suffered "a stroke in the brain."[1] (Tr. 46). Price testified that he has headaches "[a]ll day, every day," which require him to lie down for an hour or two, as well as numbness in his legs and feet and tingling in his hands. (Tr. 47-48, 55). He takes oral medication for diabetes and, for approximately ten years, has kept this condition under control with diet and medication. (Tr. 49). Price also testified that he has pain in his hips, elbows, shoulders, knees, and fingers. (Tr. 50-51). Price testified that he can lift 50-60 pounds, but upon further questioning by his attorney, indicated that he had not lifted more than a gallon of milk in the "last couple of years." (Tr. 53-54). Price can walk only half a block before his legs start "burning," can stand for 15-20 minutes, and can sit for about 15 minutes. (Tr. 54-55).

Price also testified that he experiences mood swings and does not like "to be around people." (Tr. 44). In addition, he is depressed as a result of his medical condition. (Tr. 46). At the time of the hearing, Price had an upcoming mental health appointment but was not taking any prescribed medication. (Tr. 45). He testified that, in the past, he had taken Lexapro and Abilify for depression. (Tr. 43-44). Price testified that he does not attend church, has one friend, and has difficulty staying focused. (Tr. 53).

### 3.    *Medical Evidence*

#### (a)    *Physical Impairments*

The ALJ found that Price suffers from the severe physical impairments of hypertension, obesity, and heart disease.[2] (Tr. 26-27). Evidence regarding these conditions is discussed below.

---

[1] There is no medical evidence of such an alleged stroke in the record.

[2] The ALJ also found that Price's blurred vision, "stroke," joint pain, diabetic neuropathy, and headaches do not constitute severe impairments. (Tr. 26-27). Price has not challenged these

(1)      *Records Submitted at the Administrative Hearing*

Price underwent quadruple bypass cardiac surgery in January 2008.  (Tr. 368).  Around that same time, he also was diagnosed with diabetes, high blood pressure, and high cholesterol.  (*Id.*).  A few weeks after the surgery, Price's cardiologist, Dr. Stelian Marinescu, noted that Price had a mild degree of congestive heart failure and gradually increasing lower extremity edema and shortness of breath.  (Tr. 274).  At a follow-up visit on February 28, 2008, Dr. Marinescu noted that Price had undergone a stress echocardiogram, which showed borderline normal left ventricular ejection fraction estimated at 45-50%, a mild degree of concentric left ventricular hypertrophy, and a mild degree of mitral regurgitation.  (Tr. 271).  Price's medications were managed and he was permitted to enroll in a cardiac rehabilitation program.  (*Id.*).

In June 2008, Price went to the emergency room for treatment of uncontrolled high blood sugar.  (Tr. 319).  Chest x-rays showed a mildly enlarged heart with no other abnormalities.  (Tr. 323).  Price claimed that he had been taking his prescribed medications, but the emergency room physician noted that there was a "[q]uestion of adherence issues."  (Tr. 319-20).

On March 3, 2009, Price returned to Dr. Marinescu for a follow-up visit.  (Tr. 270).  At that point, his overall condition was stable, except for mild shortness of breath with usual domestic activities.  (*Id.*).  Dr. Marinescu noted that Price recently had been treated at the hospital for complaints of chest pain, but that the type of pain was "quite atypical for angina pectoris and mostly suggestive of musculoskeletal syndrome."  (*Id.*).  Price admitted that he continued to smoke three or four cigarettes per day and said that he was running out of his medications "due to financial hardship."  (*Id.*).  The next day, Price was taken to the hospital after he called an ambulance for himself when he began to feel nauseated and lightheaded.  (Tr.

---

conclusions; thus, records pertaining to these conditions will not be discussed in detail herein.

344-45).  He was given insulin and discharged.  (*Id.*).

Later that month, on March 27, 2009, Dr. Sarah Jacob completed a Medical Examination Report, in which she assessed Price's physical limitations.  (Tr. 276-77).  She opined that Price could occasionally lift 20 pounds; frequently lift less than 10 pounds; and stand and/or walk for less than two hours in an eight-hour workday.  (Tr. 277).  Dr. Jacob further opined that Price could not reach, push/pull, engage in fine manipulation, or operate foot/leg controls.  (*Id.*).

In August 2009, Price again presented to the emergency room for treatment of high blood sugars, indicating that he had been out of medication for the past month because of insurance problems.  (Tr. 305).  He had a normal cardiovascular assessment and was given medication. (Tr. 306-07).

Price went to the emergency room again in October 2009, this time with complaints of chest pain.  (Tr. 279).  He underwent cardiac diagnostic imaging that revealed findings consistent with a previous infarction in the inferior wall with some associated ischemia, and a low ejection fraction of 27% with akinesis of the inferior wall.  (Tr. 295).  He had mildly reduced left ventricular systolic function and evidence of myocardial ischemia.  (Tr. 292).

In February 2010, Price presented to the emergency room for treatment of elevated blood sugar.  (Tr. 330).  He said that he had not taken his medications for approximately one month because he could not afford them and requested refills.  (*Id.*).  He was referred to a clinic and his medications were refilled.  (*Id.*).

In January 2011, Price presented to a clinic for a refill of his medications.  (Tr. 376-77). The next month, Price returned to the clinic for a follow-up visit and reported that he had been unable to fill his prescriptions.  (Tr. 372).  He also indicated that he had been experiencing progressively worsening chest pain and shortness of breath for approximately two years.  (Tr.

372).  Price's medications were managed, and several tests were ordered.  (Tr. 373).

In January 2012, Price presented to the emergency room for treatment of a headache and neck pain.  (Tr. 443-49).  It was noted that Price had been seen for the same complaints the week before, but had been unable to get his prescriptions filled and the symptoms were persisting.  (Tr. 446).  It appears that both a brain MRI and an echocardiogram were ordered (Tr. 450), although the results of these tests are not in the record.

In February 2012, Price presented to Dr. Jonathan Levi in follow-up to his last hospital visit, as well as for management of his hypertension and diabetes.  (Tr. 455).  At that time, he reported that he had been out of medication "for at least a month."  (*Id.*).  Dr. Levi diagnosed a number of conditions, including acute pain due to trauma, essential hypertension, high cholesterol, diabetic neuropathy, poorly controlled diabetes, obesity, and three vessel coronary artery stenosis.  (*Id.*).  Dr. Levi ordered laboratory tests and prescribed medications.  (Tr. 456).

Price returned to Dr. Levi in March 2012 for treatment of his chronic conditions.  (Tr. 454-55).  At that visit, it was again noted that his diabetes was poorly controlled.  (*Id.*).  The next month, Price reported that he had again run out of medications because he could not afford them, and he complained that his calves tightened when he walked.  (Tr. 453).

(2)     <em>Records Submitted to the Appeals Council</em>

The administrative record also contains evidence regarding Price's physical impairments that was first submitted to the Appeals Council after the ALJ issued his decision in this case.

i.      <em>Medical Evidence Related to Price's<br>Physical Impairments Dated Before<br>July 20, 2012, the Date of the ALJ's Decision</em>

On September 4, 2011, Price was admitted to the hospital with complaints of recurrent chest pain and shortness of breath and lower extremity claudication.  (Tr. 524).  Price also indicated that, for the past three months, he had experienced pain in his right lower extremity,

7

which occurred when he walked less than a block and required him to stop and rest. (*Id.*). Dr. Marinescu, who saw Price in the hospital, stated that Price had possible angina pectoris and lower extremity pain suggestive of claudication/peripheral arterial disease. (Tr. 524-25). An echocardiogram performed the same day showed a mild degree of concentric left ventricular hypertrophy with an ejection fraction around 45%. (Tr. 525). A lower extremity ultrasound performed on September 6, 2011, showed a totally occluded superficial femoral artery. (Tr. 516). As a result, Price underwent a cardiac catheterization on September 7, 2011. (Tr. 526-27).

On September 19, 2011, Price had a follow-up visit with Dr. Marinescu, who noted that the cardiac catheterization had resulted in successful stent angioplasty. (Tr. 506). Dr. Marinescu reviewed with Price the results of his recent lower extremity arterial ultrasound study, which "documented totally occluded superficial femoral artery in the mid portion." (*Id.*). He further indicated that Price's "physical activities are limited by claudication." (*Id.*). Dr. Marinescu noted that Price was homeless, had no financial support, and had no insurance coverage; he urged Price to try to obtain insurance coverage so that he could be scheduled for an angioplasty of the right superficial femoral artery. (*Id.*).

Price next saw Dr. Marinescu in December 2011. (Tr. 505). At that time, Price reported feeling fatigued with mild shortness of breath on exertion and occasional episodes of palpitation and dizziness. (*Id.*). Dr. Marinescu noted that Price had stopped taking Plavix due to "the cost and his financial problems," and stressed that he "needs health insurance coverage in order to be able to take his medications that are appropriate for his cardiac condition." (*Id.*).

      ii.    *Medical Evidence Related to Price's Physical Impairments Dated After July 20, 2012, the Date of the ALJ's Decision*

Price also presented evidence that, between July and September 2012, he presented to a clinic approximately once a month for treatment of his chronic physical conditions. (Tr. 616-

8

23).  At more than one of these visits, Price reported not taking his medications because he could not afford them, or "stretching" them until he could obtain refills.  (Tr. 619, 622).

### (b)    Mental Impairments

The ALJ also concluded that Price suffers from an affective disorder, which he found to be a severe mental impairment.  (Tr. 26-27).

### (1)    Records Submitted at the Administrative Hearing

On February 4, 2011, Price presented to a social worker at Detroit Central City with complaints of depression, hopelessness, worthlessness, insomnia, and memory impairment.  (Tr. 402-08).  He reported being homeless "for about a year"; at the time, he was residing at the Salvation Army Temporary Shelter.  (Tr. 406).  He indicated that his medical condition was getting worse, which was increasing his stress.  (*Id.*).  A social worker diagnosed major depressive disorder (single episode, moderate) and assigned a Global Assessment of Functioning (GAF)[3] score of 45.  (*Id.*).  Later that month, Oluwa Davis, Ph.D., performed a psychological assessment of Price and recorded the same conclusion.  (Tr. 381-95).

On April 5, 2012, Laurie Riha, a social worker, performed a psychological assessment of Price at Community Care Services.  (Tr. 420-34).  Price reported having depression since 2002, when his mother died and he was diagnosed with diabetes.  (Tr. 420).  He reported numerous symptoms, including sadness, loss of interest in activities, low energy, fatigue, difficulty concentrating, hopelessness, worthlessness, and suicidal thoughts "when physical pain gets so bad."  (*Id.*).  Ms. Riha diagnosed major depressive disorder (single episode, severe) and assigned a GAF score of 52.  (Tr. 433).

---

[3]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

The next month, Price underwent a psychiatric evaluation at Community Care Services with Dr. Tae Park. (Tr. 416-19). Price again complained of depression, with symptoms including poor sleep, crying spells, fatigue, and poor appetite. (Tr. 416). He appeared depressed, had a blunted affect, and showed limited insight and fair judgment. (Tr. 418). Dr. Park diagnosed major depressive disorder (recurrent), assigned a GAF score of 46, characterized Price's prognosis as "guarded," and prescribed Lexapro. (Tr. 418-19).

Price returned to see Dr. Park in May 2012, complaining of depression, isolation, sadness, anxiety, fatigue, and irritability. (Tr. 468). Dr. Park again recommended counseling, prescribed medication, and ordered laboratory tests. (Tr. 472). At a follow-up visit in June 2012, Dr. Park apparently made no changes to Price's treatment plan. (Tr. 467). His GAF score remained 46. (*Id.*).

*(2)     Records Submitted to the Appeals Council*

The administrative record also contains evidence regarding Price's mental impairments that was first submitted to the Appeals Council after the ALJ issued his decision in this case.

*i.     Medical Evidence Related to Price's
Mental Impairments Dated Before
July 20, 2012, the Date of the ALJ's Decision*

On March 7, 2011, Price presented to Dr. Edward Lamsen at Detroit City Center for a psychiatric evaluation. (Tr. 474-80). He reported being homeless and feeling depressed, fatigued, and hopeless. (Tr. 474). Price had a sad affect, depressed mood, and paranoid thoughts. (Tr. 479). Dr. Lamsen diagnosed Price with major depressive disorder (single episode, severe), assigned a GAF score of 40, and prescribed Abilify. (*Id.*).

On April 7, 2011, Dr. Lamsen saw Price for a medication review. (Tr. 500-03). Price reported some improvement on the combination of medications he was taking (Abilify, Lexapro, and Benadryl), including decreased depression and no feelings of hopelessness, but continued

paranoid thoughts.  (Tr. 500).  Dr. Lamsen increased Price's Abilify dosage "to further stabilize

his psychosis."  (*Id.*).  The next month, Price reported having paranoid thoughts, but he said he

had no feelings of depression or hopelessness.  (Tr. 495).  Price presented to Dr. Davis twice in

May 2011 for therapy and reported generally maintaining mental stability.  (Tr. 481-84).

In early July 2012, Price presented to staff members at Community Care Services and

received help seeking resources such as food and healthcare.  (Tr. 566-78).

*ii.*      *Medical Evidence Related to Price's*
*Mental Impairments Dated After*
*July 20, 2012, the Date of the ALJ's Decision*

Between late July and September 2012, Price continued to present to staff members at

Community Care Services and appeared to primarily receive guidance on obtaining insurance

and physical necessities, such as food, housing, and income.  (Tr. 534-65, 579-92, 608-13, 642-

58).  In August, Price also presented to Dr. Duncan Magoon for an annual psychiatric evaluation.

(Tr. 528-33).  He continued to complain of depression, isolation, being alone, sadness, anxiety,

irritability, difficulty sleeping, racing thoughts, and mood swings.  (Tr. 528).  Dr. Magoon

assigned Price a GAF score of 46, recommended continued counseling, prescribed medication,

and ordered laboratory tests.  (Tr. 532).

Price continued to meet with staff members at Community Care Services in October 2012

for therapy and case management services.  (Tr. 624-41, 659-730).  During an individual therapy

session, Price expressed frustration over his lack of access to medical care.  (Tr. 628).  At

another appointment, he reported continued depression due to numerous physical health

problems.  (Tr. 639).

4.      *Vocational Expert's Testimony*

Annette Holder testified as an independent vocational expert ("VE") at the administrative

hearing before the ALJ.  (Tr. 56-60).  The VE characterized Price's past relevant work as

11

unskilled in nature and performed at the heavy or very heavy exertional level.  (Tr. 57).  Then, the ALJ asked the VE to imagine a claimant of Price's age, education, and work experience, who could perform sedentary work, with the following additional limitations:  an option to alternate between sitting and standing at will; no interaction with the public; only occasional interaction with coworkers and supervisors; and a low stress environment, defined as those jobs with only occasional decision making and only occasional changes in the work setting.  (Tr. 58-59).  The VE testified that the hypothetical individual would be capable of working as a packer (1,100 jobs in southeastern Michigan), assembler (1,000 jobs), or sorter (1,200 jobs).  (Tr. 59).

### C.     Framework for Disability Determinations

Under the Act, SSI and DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Price is not disabled under the Act.  At Step One, the ALJ found that Price has not engaged in substantial gainful activity since June 1, 2008, the alleged onset date.  (Tr. 26).  At Step Two, the ALJ found that Price has the severe impairments of hypertension, obesity, heart disease, and an affective disorder.  (Tr. 26-27).  At Step Three, the ALJ found that Price's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 27-28).

The ALJ then assessed Price's residual functional capacity ("RFC"), concluding that he is capable of performing sedentary work, with the following additional limitations:  an option to alternate between sitting and standing at will; no interaction with the public; only occasional interaction with coworkers and supervisors; and a low stress environment, defined as those jobs with only occasional decision making and only occasional changes in the work setting.  (Tr. 28-31).  At Step Four, the ALJ determined that Price is unable to perform his past relevant work.  (Tr. 31).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Price is capable of performing a significant number of jobs in the national economy and, thus, he is not

disabled under the Act.  (Tr. 32-33).

E.     **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

The ALJ considered Price's treatment for cardiac conditions, diabetes, hypertension, and high cholesterol and concluded that, despite these conditions, Price could perform a limited range of sedentary work. (Tr. 29-30). The ALJ did not fully credit Price's allegations, finding that he had "not treated specifically for his cardiac conditions since March 2009," which undermined his assertion that these conditions were disabling. (*Id.*). This is simply incorrect. The evidence presented to the ALJ demonstrates that, in October 2009, Price went to the emergency room with complaints of chest pain. (Tr. 279). He underwent cardiac diagnostic imaging that revealed findings consistent with a previous infarction in the inferior wall with some associated ischemia, and a low ejection fraction of 27% with akinesis of the inferior wall. (Tr. 295). He also had mildly reduced left ventricular systolic function and evidence of myocardial ischemia. (Tr. 292).

Although the Commissioner asserts that Price "does not explain why a single, isolated emergency room visit undermines the ALJ's decision" (Doc. #19 at 23), the ALJ's failure to consider this evidence is erroneous for two reasons. First, the ALJ did not merely gloss over or

minimize the import of these October 2009 records; rather, he affirmatively discredited Price's allegations because he believed that Price had "not treated specifically for his cardiac conditions since March 2009." (Tr. 29). This was simply not accurate and, as a result, the ALJ's credibility finding is not supported by substantial evidence. *See, e.g., Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011) ("In sum, while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence."); *Johnson v. Comm'r of Soc. Sec.*, 2013 WL 4669997, at *11 (E.D. Mich. Aug. 30, 2013) (remanding where the ALJ's credibility determination was not supported by substantial evidence).

Moreover, the October 2009 medical findings were far more significant than the Commissioner suggests. Specifically, evidence of ischemia, a low ejection fraction (27%), and impaired systolic function are all relevant at Step Three (in determining whether Price meets or medically equals Listing 4.02 or 4.04). Although the Court cannot (and should not) determine whether Price satisfies a Listing's requirements, the ALJ's error in overlooking this medical evidence was significant, as a conclusion that he meets or medically equals a Listing would have resulted in a presumptive finding of disability. *See Christephore v. Comm'r of Soc. Sec.*, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012). The potential impact of the ALJ's error is made more acute by the fact that Price previously was approved for a closed period of disability, from February 25, 2005 through April 2, 2008, related to his cardiac issues. (Tr. 42-43, 65-73).

In addition, the ALJ indicated that Price's "lack of regular, ongoing treatment" for his cardiac conditions "undermines [his] assertion that the cardiac impairments are disabling." (Tr. 29-30). This, too, was error. Again, if Price meets the Listing, that finding would be dispositive. Moreover, before the ALJ weighs against Price any purported lack of treatment, he must

16

consider other explanations for this behavior.  *See Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").  This Ruling further provides that "explanations provided by the individual may provide insight into the individual's credibility." *Id.*  Here, the ALJ's credibility determination is flawed because he failed to meaningfully consider other reasons for Price's purported "lack of regular, ongoing treatment" for his cardiac conditions.  (Tr. 29-30).  Specifically, the record is replete with references to the fact that, during the relevant time period, Price was homeless and was, at various times, living in temporary housing shelters, with his sister, and in his van.  (*See, e.g.,* Tr. 381, 387, 393).  The record also contains evidence that Price did not have health insurance, which impaired his ability to seek treatment.  (*See, e.g.,* Tr. 270, 305, 329, 362).  In sum, the ALJ erred in discounting Price's credibility without adequately considering other reasons that may have explained his failure to seek regular and continuous care for his cardiac conditions.

The ALJ erred in other regards, as well.  In determining Price's physical RFC, the ALJ discounted the March 27, 2009 opinion of Dr. Sarah Jacob, one of Price's treating physicians.  (Tr. 31).  On that date, Dr. Jacob opined that Price could occasionally lift 20 pounds; frequently lift less than 10 pounds; and stand and/or walk for less than two hours in an eight-hour workday.  (Tr. 276-77).  Dr. Jacob further opined that Price could not reach, push/pull, engage in fine manipulation, or operate foot/leg controls.  (*Id.*).  The ALJ gave this opinion "little weight" for two reasons:  (1) the medical evidence provided no basis for limitations on pushing, pulling,

17

reaching, manipulating, or using foot controls; and (2) the opinion that Price could lift "25 pounds" was "inconsistent with capacity to stand/walk no more than 2 hours per day." (Tr. 31).

In his complaint,[4] Price argues that the ALJ did not give good reasons for giving Dr. Jacob's opinion "little weight." (Doc. #1 at ¶4). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §416.927(c). In addition, the treating source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating source opinion. *See Wilson v. Comm'r of Soc. Sec.*, 2012 WL 6737766, at *8 (E.D. Mich. Nov. 19, 2012); *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record").

In this case, as discussed above, the ALJ articulated two reasons for giving Dr. Jacob's opinion "little weight": namely, he believed the medical evidence provided no basis for limitations on pushing, pulling, reaching, manipulating, or using foot controls; and he viewed Dr. Jacob's opinion regarding Price's lifting capacity as inconsistent with her opinion that he could stand/walk no more than 2 hours per day. (Tr. 31). As an initial matter, the ALJ erred in stating

---

[4] The arguments contained in Price's complaint are being addressed by the Court because Price, who currently is proceeding *pro se*, asked the Court in his motion for summary judgment to "look at the complaint." (Doc. #1 at 2). The Commissioner addressed arguments advanced by Price in his complaint as well. (Doc. #16 at 22-23).

that Dr. Jacob "opined the claimant is capable of lifting up to 25 pounds …." (*Id.*).  As set forth above, Dr. Jacob opined that Price could lift up to 20 pounds.   (Tr. 277).   Although the Commissioner argues that this distinction is insignificant (Doc. #19 at 22), the Court disagrees, at least based on the ALJ's particular analysis of the issue.   The ALJ did not explain *why* he believed Dr. Jacob's opinions as to Price's lifting and standing/walking capacities were internally inconsistent, and the Court does not immediately see why this is so.  Dr. Jacob opined that Price could lift up to 20 pounds only *occasionally* (i.e., 1/3 of an eight-hour day, or approximately 2.6 hours per day); thus, this ability, on its face, does not necessarily conflict with an ability to stand and/or walk for two hours in an eight-hour work day.  Moreover, it is certainly conceivable that Dr. Jacob believed Price could lift up to 20 pounds, on an occasional basis, while seated.  In that case, there would be no inconsistency at all between Dr. Jacob's opinions as to Price's lifting and standing/walking capacities.  Thus, the ALJ failed to give "good reasons" for giving little weight to Dr. Jacob's opinion.

　　　For all of the above reasons, the ALJ's conclusion that Price is not disabled is not supported by substantial evidence, and remand is warranted.[5]

---

[5] Additionally, the Court notes that the ALJ discounted Price's claim that his mental impairments are disabling, in part, because he "barely treats currently" for his depression and because his "single GAF score of 46, although generally suggestive of no work ability, is outweighed by [his] limited treatment, medication non-compliance, and the history of the condition, which shows no significant deterioration since the alleged onset."  (Tr. 30).  As Price points out in his complaint, he was precluded from receiving regular mental health treatment because of mental and financial problems.  (Doc. #1 at ¶6).  And, as the Commissioner concedes, the Sixth Circuit has recognized that, for some mental disorders, the failure to seek treatment is simply another symptom of the disorder itself.  *See White*, 572 F.3d at 283.  More importantly, the ALJ – in referencing a "single GAF score of 46" – ignores the fact that, at the time of the administrative hearing, the record contained evidence not of a "single GAF score," but of four GAF scores:  45, assigned by a social worker at Detroit Central City on February 4, 2011; 52, assigned by a social worker at Community Care Services on April 5, 2012; 46, assigned by Dr. Tae Park (of Community Care Services) on May 9, 2012; and 46, assigned by Dr. Park at a follow-up visit on June 2012.  (Tr. 393, 418, 433).  Because the ALJ apparently overlooked this series of low GAF

Price also appears to argue, pursuant to sentence six of 42 U.S.C. §405(g), that the Court should remand the case to the ALJ because significant evidence submitted for the first time to the Appeals Council would have altered the ALJ's decision.  (Doc. #16 at 1-2; Doc. #1 at ¶8).  The Court need not address this issue in detail, as it has recommended remand pursuant to sentence four of 42 U.S.C. §405(g).  However, the Court notes that, although Price was represented by counsel at the administrative hearing, his attorney – for reasons Price, now proceeding *pro se*, is unable to explain – failed to submit to the ALJ numerous medical records that were first submitted to the Appeals Council.  (Tr. 474-730).  That failure is perplexing since the ALJ had agreed to hold open the administrative record to allow the submission of additional medical evidence (Tr. 41), and since it appears that certain additional records were, in fact, submitted.[6]  Moreover, many of these records were in existence at the time of the administrative proceeding and were critical to adequate Step Three and RFC analyses.  On remand, the ALJ should consider all of the medical evidence presented in order to thoroughly and properly evaluate whether Price is disabled under the Act.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [19] be DENIED, Price's Motion for Summary Judgment [16] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks

---

scores, all of which are "generally suggestive of no work ability" (Tr. 30), and seemed to rely on a mistaken belief that only one such score existed, the Court cannot conclude that his mental RFC finding is supported by substantial evidence, and the ALJ should address this issue on remand.

[6] At the administrative hearing, the ALJ indicated that he was admitting Exhibits B1A through B9F.  (Tr. 41).  But, the Appeals Council's Order indicates that it received additional evidence, which it made part of the record, including Exhibits B10E (a brief) and B14F through B21F.  (Tr. 5-6).  Thus, where the record now contains Exhibits B10F through B13F (Tr. 416-73), it certainly appears that these records were submitted by Price's attorney after the administrative hearing but before the case was appealed to the Appeals Council.

an award of benefits, and that this case be remanded to the ALJ for further proceedings consistent with this Recommendation.

Dated: December 12, 2013                     s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 12, 2013.

                                             s/Felicia M. Moses
                                             FELICIA M. MOSES
                                             Case Manager

21